UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
          v.                      )     Criminal No. 05-10076-NMG
                                  )
KENYATTA ELIJAH JAHKUR            )
                                  )

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

Now comes the United States and hereby opposes the defendant's Motion to Suppress in the above-referenced case. As reasons therefore, the United States submits the following memorandum.

## I.    INTRODUCTION

The defendant, Kenyatta Elijah Jahkur, was charged by Indictment with possession of two firearms and ammunition by a convicted felon in violation of 18 U.S.C. 922(g)(1). He filed a motion to suppress the two firearms and the ammunition, claiming that he was stopped and searched in violation of Terry v. Ohio, 392 U.S. 1 (1968). Because the encounter between the defendant and Sergeant Goyette of the Quincy Police Department was consensual, and because every one of Sergeant Goyette's actions was reasonable, the defendant's motion should be denied.

Following the defendant's flight from a one car accident with property damage, Sergeant Goyette encountered the defendant outside a house near the scene, and spoke with him about the

1

accident.  During the brief conversation, the defendant asked
Sergeant Goyette to give him a ride, because his car had been
damaged in the accident.  Prior to entering the sergeant's car,
the defendant, on his own initiative, and in response to the
question of whether he had any weapons on him, raised his arms
upward.  When the sergeant, reasonably believing the defendant
was indicating that the officer could check him for weapons
before he entered the officer's car, did a pat-frisk, he
immediately felt one of the guns.

The officer's actions in stopping to speak with the
defendant, agreeing to give him a ride, asking him if he had any
weapons, and frisking him at the defendant's apparent invitation,
were all eminently reasonable; the defendant's motion should be
denied.

## II.  FACTS[1]

On November 11, 2004, at approximately 3:00a.m., Sergeant
Greg Goyette of the Quincy Police Department responded to a
report of a single car accident on High Street in Quincy.  As
Sergeant Goyette approached the accident scene he received an
updated report that a caller had stated the driver of the car had
walked away from the accident up Franklin Street.  Upon arrival

---

[1] The facts herein are the facts the government expects to
prove at an evidentiary hearing on this matter through the
testimony of Sergeant Greg Goyette of the Quincy police
department.

at the scene, Sergeant Goyette observed that a white Chevy Corsica had hit a telephone pole and almost snapped the pole in half.  Sergeant Goyette also noticed that the driver's side airbag was deployed.

As Sergeant Goyette began to drive around the area to locate the driver of the car, he received a broadcast from communications that the car was registered to a person who lived on Winter Street in Quincy.  Sergeant Goyette  drove toward the Winter Street area and saw a lone person walking on a nearby street on the left hand side of the road.  As Sergeant Goyette made his way down the street, he observed the individual glance over his right shoulder and then quickly turn to the left and walk briskly across the front lawn of a house and go behind some shrubs.

Sergeant Goyette continued down the street and slowed in the area where he had seen the individual.  As Sergeant Goyette began to make a left hand turn onto an intersecting street, he saw the same individual standing near the door of a house located at the corner of the two streets.  Sergeant Goyette  stopped his cruiser and notified communications of his location and situation. Sergeant Goyette could see that the individual was a male wearing a dark, bulky jacket over a lighter colored sweat jacket.  The man also had a blue backpack.

As Sergeant Goyette exited his cruiser, he noticed that the

3

man stood motionless and stared towards the door of the house, despite the obvious presence of a police car and police officer. Sergeant Goyette also noticed that the man was standing slightly away from the door in such a way as to avoid detection, and not as one would stand if he were hoping to enter through the doorway to the house.

As Sergeant Goyette began to walk towards the defendant, the defendant finally acknowledged him.  Sergeant Goyette asked the defendant what was going on and the defendant said, "Man! I'm glad you're here!"  When Sergeant Goyette asked why, the defendant stated that he just had an accident in his girlfriend's car and he was going to her house to tell her about it.  Sergeant Goyette asked the defendant where the accident had happened.  The defendant replied that it was up the street and motioned in the direction of High Street.  Sergeant Goyette asked the defendant if he was driving and the defendant said that he was.  The defendant produced a Massachusetts drivers license with the name Eliijah Jahkur, DOB: 08/09/1978.

After producing his license, the defendant asked Sergeant Goyette for a ride to the defendant's girlfriend's house. Sergeant Goyette told the defendant that he would take him there but that he wanted to go to the accident scene first; the defendant agreed.  Sergeant Goyette noted that the defendant seemed very nervous and was anxious to leave the area.  Despite

4

the very cold night, the defendant was sweating and looked around frequently.  When Sergeant Goyette asked the defendant why the defendant was standing at the door of the house, the defendant stated that he was trying to wake someone to use the telephone so that he could report the accident.  Sergeant Goyette had not seen the defendant ever approach the door to the house to ask for help, and in fact, it appeared to Sergeant Goyette that the defendant had been trying to avoid police detection.

Before allowing the defendant into the rear of his cruiser, which did not contain a protective cage, Sergeant Goyette asked the defendant if he had any weapons on him.  The defendant stated that he did not and moved both arms upward, signifying to Sergeant Goyette that the sergeant could check.  As Sergeant Goyette patted the outside of the defendant's outer coat, he felt a large, hard object on the defendant's left hip, which Goyette immediately recognized to be the slide of a firearm.  Sergeant Goyette quickly ran his hand upward and felt what he believed was the handle of a gun.  Sergeant Goyette then asked the defendant if he had a gun.  The defendant looked at Goyette with his eyes wide and stammered, "ahh!."  Sergeant Goyette grabbed as much of the gun as he could, and asked the defendant if he had a license for the gun.  The defendant said, "Just let me go, man!"  Goyette then felt Jahkur's body stiffen and tense up.

At this time another officer arrived and assisted Sergeant

Goyette in handcuffing the defendant.  The officers then removed

the firearm, a 9mm Glock, from the defendant's left waistband.  A

further pat frisk revealed a second gun, a Taurus revolver, in

the right hand pocket of the defendant's inner jacket.  Both guns

were loaded and the Glock had an obliterated serial number. The

officers also found a pair of handcuffs in Jahkur's backpack.

## III. Argument

### A. The Encounter Between Sergeant Goyette and The Defendant Was Consensual and Therefore Did Not Implicate the Fourth Amendment

While the Fourth Amendment protects against unreasonable

search and seizures, not all encounters between law enforcement

officers and citizens constitute seizures.  "Law enforcement

officers do not violate the Fourth Amendment's prohibition of

unreasonable seizures merely by approaching individuals on the

street or in other public places and putting questions to them if

they are willing to listen." U.S. v. Drayton, 536 U.S. 194, 200-

201 (2002); U.S. v. Young, 105 F.3d 1, 6 (1st Cir. 1997).  As the

Supreme Court has found, it's only when a citizen's freedom of

movement is objectively restrained that there is any foundation

for invoking constitutional safeguards. U.S. v. Mendenhall, 446

U.S. 544, 553 (1980).  As such, law enforcement officers are free

to ask to examine a person's airline ticket, Florida v.

Rodriguez, 469 U.S. 1, 5-6 (1984)(per curiam); ask for

identification, <u>U.S. v. Collis</u>, 766 F.2d 219, 221 (6th Cir 1985);
and even enter someone's home, <u>U.S. v. Garcia</u>, 339 F.3d 116, 119-
120 (2nd Cir. 2003).

There can be no question that the November 11, 2004,
encounter between Sergeant Goyette and the defendant was
consensual.  The officer simply walked toward the defendant, in a
non-threatening manner, with his weapon holstered, and asked him
what was going on.   There was nothing in the sergeant's actions
or words that would lead a reasonable person to believe he or she
was not free to leave rather than respond at that point in time.
<u>See</u> <u>Young</u>, 105 F.3d at 6 (consensual encounter when officers
asked defendant if he "got a minute to talk.")  Indeed,
defendant's response to Sergeant Goyett's approach could only be
construed as welcoming.  The defendant said, "Man! I'm glad
you're here," and then asked the sergeant to give him a ride to
his girlfriend's house.  Given that it was defendant's request
that resulted in the continued interaction between him and
Sergeant Goyette, the interaction was clearly seen by both
parties as consensual.

### B. <u>Even If The Court Finds The Interaction Was Not A Consensual Encounter, It Was Permissible As A Stop Under Terry v. Ohio.</u>

Even if the Court determines that the conversation between
Sergeant Goyette and the defendant on November 11th was not a
consensual encounter, any alleged "stop" was permissible under

the warrant exception set forth in <u>Terry v. Ohio</u>.  In <u>Terry</u>, the Supreme Court held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest."  <u>Terry</u> at 22.  The <u>Terry</u> exception is warranted when the officer can "point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop [is] warranted."  <u>U.S. v. Maguire</u>, 359 F.3d 71, 76 (1st Cir. 2004).

Here, Sergeant Goyette had already viewed the accident scene and determined that there was extensive and obvious property damage.  He had been notified (and could see for himself) that the driver of the car had fled the scene of the accident. Leaving the scene of an accident after property damage, while not an arrestable offense, is a criminal offense in Massachusetts. <u>See</u> Mass. Gen. L. c. 90, §24.  As such, Sergeant Goyette had a duty to investigate that crime in addition to confirming that the driver of the car was physically alright.

As Sergeant Goyette investigated the area around the accident scene, he was notified that the owner of the car lived on Winter Street.  As Goyette traveled that way, he saw someone walking on the street alone.  When the person glanced over at the police car, he immediately walked across the front lawn of a

8

private residence and went behind the shrubs.  When Goyette again saw the person, he was standing to the side of another house and appeared to be trying to avoid detection.  It was approximately 3:00 a.m.  Given all of the facts, it was certainly reasonable for Sergeant Goyette to stop the defendant and ask some preliminary investigative questions to determine if the person was the individual that Sergeant Goyette was looking for who had fled the accident scene.

**C.** **The Pat Frisk Conducted By Sergeant Goyette Was Consented To By the Defendant**

Law enforcement officers may conduct a search without a warrant or probable cause based upon on individual's voluntary consent.  U.S. v. Luciano, 329 F.3d 1,7 (1st Cir. 2003).  This consent can be express or implied and can be inferred from both verbal and non-verbal conduct.  Robbins v. MacKenzie, 364 F.2d 45 (1st Cir. 1966).  Courts look to the totality of the circumstances to determine if consent was given and given voluntarily.  Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

The First Circuit has previously upheld a finding of consent based on non-verbal conduct.  In Robbins, supra, the District Court of Maine found the defendant had consented to a search of his room when, in response to a police knock on the door, the defendant unlocked and opened the door and walked back into the

9

room.  The First Circuit noted the defendant had "express[ed] by
his actions as adequate a consent to entry as he would by a
verbal invitation."  Id at 48.  See also U.S. v. Zapata, 18 F.3d
971, 977 (1st Cir. 1994)(non-verbal act of handing over car keys
can itself support an inference of consent).  Other Circuits have
found the same.  In U.S. v. Mendoza-Cepeda, the Eighth Circuit
found the defendant had non-verbally consented to a search of his
person when, in response to an agent's request to search the
defendant's torso, he "raised his arms and allowed Sergeant Burns
to touch his torso." 250 F.3d 626 at 627.  See also U.S. v.
Villegas, 388 F.3d 317 (7th Cir. 2004) (quoting U.S. v. Ramirez-
Chilel, 289 F.3d 744, 752 (11th Cir. 2002)("Consent may be
manifested in a non-verbal as well as verbal manner.")).

     The facts support Sergeant Goyette's reasonable belief that
the defendant had consented to a search of his person.  It was
the defendant, not the sergeant, who requested a ride in the
officer's car.  When Sergeant Goyette mentioned to the defendant
that he wanted to first drive to the accident scene, the
defendant agreed.  And when, before entering the car, the
sergeant asked the defendant if he had any weapons, the defendant
raised his arms in the air.  It was certainly reasonable for
Sergeant Goyette to interpret those actions as an invitation to
search. See Mendoza-Cepeda, 250 F.3d at 629 ("The Fourth
Amendment requires only that the police reasonably believe the

search to be consensual.")

In addition, such consent was voluntarily given.  In determining voluntariness, courts look to the totality of the circumstances, including a defendant's knowledge of his/her constitutional right to refuse consent, as well as his/her age, intelligence and language ability.  See U.S. v. Fornia-Castillo, 408 F.3d 52, 62 (1st Cir. 2005).  Here, there was absolutely no indication that the defendant, a 26 year old man, did not understand the English language or the officer's question. Indeed, they had just finished a conversation.  In addition, the defendant has a prior criminal history involving kidnaping and armed robbery, evidencing his knowledge of his right to refuse consent.  See U.S. v. Becker, 333 F.3d 858, 861-62 (8th Cir. 2003)(consent voluntary because suspect had knowledge of rights from prior experience with law enforcement); see also U.S. v. Forbes, 181 F.3d 1, 5-6 (1st Cir. 1999) (finding voluntary consent in part because of defendant's prior criminal record).

**D.** **Even if the Court Finds Defendant Did Not Consent, The Search Was Reasonable Under the Fourth Amendment.**

In Terry, the Supreme Court noted that a law enforcement officer may conduct a limited frisk for weapons during an investigatory stop.  See Terry, 392 U.S. at 27, 30.  Courts have held that such a frisk is allowable if the officer has a reasonable belief that the detainee poses a threat to the

11

officer.  <u>See</u>, <u>e.g.,</u> <u>U.S. v. Valentine</u>, 232 F.3d 350, 357 (3rd Cir. 2000) (frisk justified because suspect's presence in high-crime area in early morning, and suspect flight after spotting car, gave cause to fear presence of weapons).

Although Sergeant Goyette believed he was responding only to the crime of leaving the scene of a car accident, the defendant's actions made the sergeant's suspicion of possible weapons reasonable.  During their conversation, the defendant stated that he was trying to find a phone to call his girlfriend for help as a result of his car accident.  But when the defendant had first spotted the police car in the street, he immediately turned and cut through the lawn of a private residence and went behind some shrubs as if to evade the police.  When Sergeant Goyette next noticed the defendant, he was standing to the side of a house as if he was trying to avoid detection.  Indeed, when the Sergeant first approached the defendant, the defendant remained motionless, as if trying to not be seen.  While they were speaking, Sergeant Goyette noticed that the defendant appeared nervous and was sweating, despite the cold evening.  It was 3:00 a.m. at the time.  Finally, the defendant stated he had been knocking at the door to try to wake someone to use the phone, but the sergeant had seen the defendant quite a distance from the door and the fact that no one came to the door reinforced the officer's perception that the defendant was lying on that point.

12

Given all of these observations and the defendant's request for a ride, it was entirely reasonable for the officer to check the defendant for weapons before allowing him in his car, which did not contain a security cage.  See United States v. Cruz, 156 F.3d 22, 26 (1st Cir. 1998)(officer would have been "foolhardy" not to frisk given time of day--1:22 a.m., location of stop, behavior of occupants, and occupants outnumbering officer five to one).

**IV.  Conclusion**

For the reasons stated above, the United States respectfully requests that defendant's Motion to Suppress be denied.

Respectfully Submitted
For the United States

MICHAEL J. SULLIVAN
United States Attorney

/s/ Dana Gershengorn
Dana Gershengorn
Assistant United States Attorney
U.S. Attorney's Office
One Courthouse Way
Boston, MA 02210
617-748-3120

Date: November 4, 2005

I hereby certify that I have this 4th day of November, 2005, served a copy of the United States' Opposition to Defendant's Motion to Suppress on defense counsel of record, Michael F. Natola, by electronic filing.

/s/Dana Gershengorn
Dana Gershengorn
Assistant United States Attorney